Good morning. My name is Victor Segovia and I represent Ms. Olivia Duarte. In brief, this case is about an elderly woman who at some point decides, who's following the advice of her gastroenterologist to seek help from another doctor. Basically, she's dealing with a bout of depression. At some point, in looking for a doctor, she calls upon the Napa State Hospital, and not knowing what type of institution it is, but knowing that it is a hospital, she calls and says, I'd like to make an appointment with a doctor. She gets called back from a crisis nurse, Ms. Petrillo, and that's where the whole thing sort of starts to fall apart. Ms. Petrillo is unable to speak to her very well. Maybe she doesn't speak Spanish very well. She enlists the help of a staff person, I believe it's a janitor, and then begins to discuss or try to find out why Ms. Duarte is searching for a doctor. While she's doing this, Ms. Petrillo senses some urgency in her mind and ultimately calls 911 to have police officers check on Ms. Duarte. Ms. Duarte is contacted in her home. They knock on her door. She lets them in. They identify themselves as police officers because they are, in fact, dressed as police officers, and then she begins to find out why they are there. They're telling her, you know, what's going on. They search her place. She's asking what's going on, what's happening here. They start basically saying, in effect, that she's coming with them. She's saying she doesn't want to go anywhere with them. She wants to stay home and stay because she is trying to follow the advice of her doctor. She finally gets it in her head that these officers are here because of the phone call she had received earlier from the Napa State Hospital nurse. Now, the whole case basically centers on that encounter in her house where the officers don't have any observations of anything unusual happening with Ms. Duarte other than she's at home and had originally been talking to her doctor. Yeah, okay. But just let me back up a minute. This is an appeal from a judgment on immunity? This is an appeal on judgment on a grant of immunity to the officers without an analysis on whether or not there was a violation and whether or not the officers were following the Welfare and Institutions Code, Section 5150. Okay. Are you also appealing from the judgment in favor of the nurse? I am. Well, before you get to the officers, could you tell us what the nurse did wrong? Okay. What the nurse did wrong is she contacted the officers and made numerous statements to the officers that were not actually true. She basically said, I'm on the phone with a patient. Ms. Duarte was not her patient. She says the initial, I'm on the phone, and she's talking with an interpreter. The person really wasn't an interpreter. It was a janitor who spoke English and Spanish, and we don't know whether or not the interpretation was taking place at that time, whether it was accurate, whether it was truthful, whether the janitor even knows Ms. Duarte's culture or Spanish or whatever. But she's saying to the officers, I believe that Ms. Duarte may drive off of something or into something, and on that basis I believe you ought to do what's called a welfare check. The other parts of the conversation that are ---- Well, what did she do? So she misunderstood? Is that basically what she did wrong? She misunderstood, and she also understood enough of the situation to create an air of urgency for the officers, knowing that if she were to say, well, Ms. Duarte is sitting in her own home, there's nothing wrong with her other than she's looking for a doctor, the police is probably going to say we're not going to go visit, we're not going to go check on her. But what she's saying is that when the dispatcher says to Ms. Petrillo, has she tried to hurt herself today? She says no. Has she ---- Do you know any history of her? No. What do you know about her? Well, she has high cholesterol because ---- So what constitutional right of your client did the nurse violate? The constitutional right of my client that the nurse violated is that they ---- she set in motion a series of events that caused the officers basically to create an air of emergency that did not exist. She gave basically misleading statements, knowing they were misleading statements, to ---- Knowing they were misleading? What evidence in the record indicates that? Well, the evidence of the record is what I said a moment ago, is that she says, I'm on the phone with a patient, and she was not ---- it was not her patient, and ---- And she deliberately said a patient rather than ---- I don't ---- A person who needs help and I'm a nurse? What's ---- And that's exactly the whole point. She sets in motion this event that I'm a nurse, crisis nurse, I'm calling you ---- She is a crisis nurse, right? Apparently she is. Right. Although we don't know if she's done any kind of evaluation. All we know at this point is she's only had one conversation with Ms. Duarte. Okay. So she set in motion that's basically ---- That's ---- She set in motion what happened at the house?  Okay. So because your time is going rapidly, why don't you get to what happened at the house? All right. She set in motion what happened to the officers. Then the officers, unfortunately, relied exclusively on what she had said when they arrived there. And once they arrived there, the officers did not conduct any independent probable cause investigation to find out if Ms. Duarte truly was suicidal or truly was. But they're police officers. They're not medical. They're not. That's right. But they are ---- they do encounter these situations routinely, and they do encounter ---- In the record, is there evidence that there's a procedure they should follow, then? No. But there is a situation here that Ms. Duarte was not observed committing any crime, was not personally observed by the officers in any way to be upset or disheveled or angry or in any ---- anything other than being disturbed by the officers' visit. What's also not in the record is that the officers made no attempt whatsoever to get a warrant or to ask for help on what do we do here. I have a ---- I have the statements of a nurse, but I'm looking at a person. I'm in their home, and I don't see anything unusual. She has no weapons. They searched her place and basically just said, we're going to take you with us. She says, I don't want to go. And I told them that she had said on the phone that she felt like hurting herself. She would drive her car into something or off of something. She was tearful. She was not sleeping, et cetera. She didn't need a weapon to drive her car off. That's true. She doesn't need a weapon to drive her car off. But the statements of that, that issue or that statement that's reportedly came from Ms. Duarte, and Ms. Duarte actually denied ever saying it. That was a statement that was given to the police, right?   And then what was not communicated properly to the police was that that statement had been actually a court allegedly said by a janitor, who then was given to the nurse, who then ---- Sotomayor, a Spanish speaker whose job at the hospital was a janitor who was translating for the nurse. Correct. Correct. I'd like to save the rest of my time for rebuttal. Well, just at what point ---- okay. You can save the rest of your time. All right. Thanks. Good morning. May it please the Court, Michael O'Flanagan appearing on behalf of the City of Petaluma and Officers Clayton Begrin and Timothy Harrison. It's my understanding that the Court wanted me to ---- or allocated seven minutes. I'll try and keep track of that to the best of my ability. Well, you're representing the city? The city and the officers, yes. And the officers. Okay. Yes. Okay. Well, since you have such a short time, let me ask a question. Please. Does Section 5150 require a finding of exigent circumstances for warrantless arrest in the home? Does it? Your Honor, the city's position is that it does. Once the conditions in the statute have been fulfilled, it indicates that there was an exigent policy circumstance requiring the detention of the individual. And the alternative, if the Court should decide that that's not the case, the officers in this instance were reasonable in their belief that the conditions for the statute had been fulfilled and that they could rely on the statute and that no further action was necessary. And what were those conditions? Well, I think that one thing that's important to point out here is that there wasn't just one conversation with the nurse in this case. There were, in fact, two. There was Nurse Petrillo's telephone call to the dispatcher, which appears in the supplemental excerpt of record at 240, and that's when she indicates that, according to her, Ms. Duarte feels like hurting herself, would drive her car into or off of something, was tearful, depressed, has not slept in a long time, and, quote-unquote, has many problems. The officers, based on that description, came to the house and entered where they spoke firsthand to Nurse Petrillo again. And according to Officer Begrin's application for the 72-hour detention, he was again told that Duarte was depressed and wants to hurt herself and that her plan was to drive on or off of something. This is where I'm not sure I understand. Are you claiming there was anything other than what the nurse said that led them to believe that there was an emergency situation there? Once they got into the house or knocked on the door, was there anything they saw? I think that based on those two conversations, including one that was contemporaneous with their arrival on the scene, and following their search. Well, I think that something else that needs to be pointed out is, according to Ms. Duarte's declaration, while she was on the phone with Nurse Petrillo at the time that the officers arrived, she was crying. And so I think that that belies the unsupported allegations by opposing counsel that she was lucid and calm while they were on the scene. There are certainly other cases that provide more evidence that would support this type of detention, but I think on summary judgment there's no undisputed issue of material fact that goes to the contrary in this instance. I also think that it's important to recall that the detention in this instance was of a limited duration and only for the purposes of a mental evaluation. The police arrived at the scene roughly around 3 o'clock in the afternoon. According to the complaints, she was taken to the hospital at 4, and according to the complaints and the medical reports, she was discharged by 8.30 in the evening. I would also direct the Court's attention to an unpublished opinion that this Court has issued, Palter v. Garden Grove. I think that the facts are at least analogous, and the reasoning of the Court in Palter was probable cause does not mean certain cause, and the purpose of the psychiatric evaluation is to have professionals skilled at evaluating mental states take some responsibility for assessing whether the individual was in danger. Now, in the alternative, you know, the city maintains that no constitutional violation occurred in this case, but in the alternative we would maintain that the officers acted reasonably based on what they received at the time. The Section 5150 standard was more than adequately fulfilled here, and it was reasonable for the officers to rely on that statute. A few more points. Again, in their briefs, opposing counsel has somehow suggested that the district court erred in its analysis of the evaluation of the evidence, and it's in consideration of the saucier standard for qualified immunity. In both instances, the Court was correct. The only disputed facts in this case go to what Nurse Petrillo was told by Ms. Duarte, and that does not in any way undermine the evidence of what the police were told. Or what she understood. Or what she understood. Again, there's also no dispute of what Officer Bagen was told at the scene, and, unfortunately, the evidence, Ms. Duarte's own declaration makes clear that her attempts to explain what was occurring were incomprehensible because the officers did not understand Spanish. Let me ask about the saucier analysis. The district court, there are two steps. Skip step one, was there a violation. Moved right into step two. What do we do about that? Your Honor, I don't actually believe that that is the case. I don't think that the district court's decision was necessarily directly linear in its reasoning. But I think that they ultimately did conclude that under the first step of saucier that there was no constitutional violation in the first instance. I would direct the Court to page 278 of the supplemental excerpts of record where the Court concludes that the Petrillo call clearly was clearly sufficient to constitute a probable cause, and then, again, later in the decision at page 281 of the supplemental excerpts of record, when discussing the city's Manel liability, the Court observes that no constitutional tort occurred. Thank you. So I think that they considered both parts of the saucier analysis in the alternative. Just a few more points, a few more very quick points. As we argued in our brief, Duarte's warrantless search and excessive force claims, as well as their Manel claim against the city, were waived in the briefing. In any event, I would direct the Court's attention to a recent decision by this Court, the United States v. Snipe 2008 decision, which deals with whether or not an emergency justifies a warrantless entry of a premises. If there are no other questions? Thank you. You've used your allotted time a little bit more. Thank you. Good morning, Your Honors. My name is Paul Hamernas. I'm a Deputy Attorney General for our State. I'm here representing one of our psychiatric nurses from Napa State Hospital, a crisis nurse by the name of Petrillo. Your Honors, I believe, focused on the key issue in the case and its questions to Mr. Segovia, and that is what did Nurse Petrillo do that was wrong? As the district court found, there was absolutely no evidence in the record to suggest that the reason that Nurse Petrillo called 911 was to somehow punish the plaintiff appellant for calling for help, and that's what she was doing. Nurse Petrillo returned a phone call. I guess when she got the call, she was originally puzzled, because Napa State Hospital is an involuntary commitment center for the State. It isn't the normal hospital that would deal with emergency commitments of a voluntary nature, which is what Ms. Duarte seemed to be seeking. And when the nurse got on the phone with Ms. Petrillo to try to, I'm sorry, Ms. Duarte to try to direct her to help, she became very concerned. It's undisputed in the record that the information she received, which she communicated in the 911 call, which you have a transcript of the tape recording, was that not only did Ms. Duarte talk about hurting herself or someone else using a car, she confirmed, as the police found when they arrived at the location, that she had access to a car. She was lonely and she was depressed. Her physician had told her to seek help for the depression, and later that day when they evaluated her at Sutter Hospital, they found that she was depressed. Although she denied suicidal ideation, I think we can accept her explanation at the time, rather than the explanation, which is fabricated later by Mr. Segovia, that there was some kind of evil intent behind Nurse Petrillo's call. If you look at the Sutter health notes, the explanation that Duarte gave to the doctor who examined her was that she felt there might have been some misunderstanding because of the poor English that she has. Now, the core of the qualified immunity analysis is reasonableness, and it's designed, I guess, the idea of immunity is to protect state officials who we pay to help people from a mistake, if mistake there was, if it is reasonable. And I would submit under these facts that if Nurse Petrillo had not notified 911 and called them, that she would have been remiss. Can I just, you've used your time, can I just ask you a question? Sure. Does the record indicate why the plaintiff called Napa State Hospital? Was it just because it happened to be close to where she lived? Well, she actually, if you look at the record, she gives a couple of reasons. One reason she gives is that she states that she had a relative who was on the staff there that she was trying to contact who would give her the name of a doctor. The explanation that was proffered to the nurse was that she understood that there might be voluntary commitments offered there, and that's why she was calling. Frankly, that remains a mystery, and we're not in a position to clear that up, and it's not clear from the record. Okay. Thank you. Thank you. Briefly, I do not want to imply, and I didn't think I was, that Ms. Petrillo had any evil intent. I just believe she had a good heart, and she was looking for some way to get the police to respond and just embellished as well as she could to make the officers appear and respond to the call. I do want to point out. Are you claiming that she embellished? Yeah. She didn't act on the basis of her actual understanding, but she told them things were worse than she understood it to be? That's basically my contention, is she was making things seem worse than they really were. Ms. Duarte was, in fact, depressed. She had been under ---- No, that's different. That's different than saying that she ---- I understand the position that she wasn't as bad as the nurse thought she was, but are you saying that the nurse lied? I ---- Is that she intentionally said something was happening that wasn't happening? I do ---- I did not understand that to be your position. I do believe the nurse intentionally said certain things that were not true. I don't necessarily say that that means she had an evil intent as well. Nevertheless, the nurse could not have known that Ms. Duarte had an automobile unless Ms. Duarte told her, correct? That seems plausible. But the nurse was also told by Ms. Duarte that she was under the care of a doctor, told her ---- Ms. Duarte told her of her clinic, told her doctor's name, told her where the clinic was, and the assumption is that she did have access to a car. And by the way, she probably had access to the car all day long and the entire time. And when she is communicating to the nurse saying, I'm looking for a doctor, she presumably had access to the car the entire time that she was basically saying, we're looking for a doctor. So there's no indication that just because she was at that moment looking ---- And the story that she wanted to harm herself or someone, drive her car into something, there was ---- if that was made up, Ms. Patria would not have known unless Ms. Duarte said something that Ms. Duarte had a car. I don't ---- Ms. Duarte did communicate with the janitor. She had an extensive conversation with the janitor, basically when she's trying to say, I'm looking for a doctor to help me with the depression because my other doctor told me to do so. What was actually said between Ms. Duarte and the janitor is not part of the record because we never got to that stage. And ---- You're accusing Ms. Patria of embroidering the story in order to get the help that she thought Ms. Duarte needed. Yes. Yes. And my comments are based simply that some of the facts that if this was an embroidered story, there were facts in it that were verified by a later determination that Ms. Duarte did in fact have a car. Well, certainly there was a Ms. Duarte. Ms. Patria got the name wrong, and then they did not get the correct address correct, and later on the ---- Okay. I think we're going beyond that. All right. You've used your time, and we think we understand your position. Thank you. The case just argued is submitted for decision. We'll hear the next case, which is ----
judges: Schroeder, Nelson, Roth